## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| KRISTI SUE FREDRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:15-cv-00487-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Kristi Sue Fredrick's appeal of the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. [Doc. 11]. For the following reasons, the Commissioner's decision is affirmed.

**I.  Background**

Plaintiff Kristi Sue Fredrick was born on October 2, 1992. She dropped out of school in eighth grade and was home-schooled at the time of her disability hearing. Fredrick performed past work as a restaurant waitress and manager. In her application filed on July 24, 2012, Fredrick alleges a disability onset date of July 20, 2012 stemming from multiple sclerosis, internal snapping hip condition, and hormonal imbalance.

**A.  Medical History**

1

In May or August 2012, Fredrick presented to her primary care physician, Dr. Anthony Gunn, complaining of pain in her head, right arm, and right leg. [Tr. 33]. Soon afterwards Fredrick stopped working at the Big Biscuit, a restaurant in Blue Springs, Missouri, because her pain made it too difficult to walk. *Id*. Fredrick reported that her episodes of pain were intermittent and that her symptoms receded for periods at a time. [Tr. 506]. She also reported back pain, blurred vision, hallucinations, and numbness in her extremities. [Tr. 504-05].

Over the following year, Fredrick presented to several physicians, mostly at Centerpoint Medical Center, who conducted a series of diagnostic and laboratory tests to determine the etiology of her pain. The results of these tests were inconclusive. Fredrick had a normal MRI, neurological exam, blood panel, urine culture, viral serology, and metabolic panel. [Tr. 234, 236, 242-43, 309, 330, 320]. She further tested negative for West Nile disease, bacterial infections, sinus thrombosis, venous thrombosis, and bone disorders. [Tr. 259-65, 291-97, 330]. Based on these tests, her physicians ruled out infectious diseases, autoimmune disorders, neurological diseases, and multiple sclerosis. [Tr. 521, 245, 509]. While one laboratory test yielded high CPK and ANA figures, subsequent rheumatology exams were unremarkable. [Tr. 279]. Fredrick also displayed some weakness and tenderness upon physical examination. [Tr. 245]. Otherwise, the tests included in her medical record do not suggest any abnormalities to explain her pain. *See* [Tr. 248-58].

Fredrick reported that she suffered from multiple sclerosis, *see* [Tr. 348], but Dr. Howard Weiss, M.D., a neurologist who examined her in November 2011, found that multiple sclerosis was an unlikely explanation for Fredrick's complaints. [Tr. 246]. Another neurologist, Dr. Robert Reddig, M.D., agreed with this assessment when he examined Fredrick in June 2013. [Tr. 506]. Dr. Reddig determined that Fredrick's pain was likely the result of migraine

2

headaches, and he recommended prophylactic and abortive migraine medications. [Tr. 512]. If that proved ineffective, Dr. Reddig wrote, he would refer Fredrick for psychiatric consulting. *Id*. Several other physicians also speculated that Fredrick's complaints were psychiatric in origin. Dr. Joe Ramsey, M.D. noted that Fredrick was under significant stress and that her pain may be stress-induced. [Tr. 234-35]. Dr. Parveen Kumar, M.D. similarly noted Fredrick's stressors and concluded her pain was likely psychological. [Tr. 279-81]. Dr. Kumar recommended that Fredrick seek a psychiatric referral. *Id*.

The record does not indicate Fredrick sought therapy, but Jane Ruedi, Ph.D., a psychologist, evaluated her in conjunction with her application for disability benefits. Fredrick reported to Dr. Ruedi that she was depressed, sad, and in pain. [Tr. 349]. She discussed episodes of childhood abuse and a history of concussions and depression. Fredrick also mentioned a history of panic attacks, but remarked that she had not recently experienced one. [Tr. 348]. Fredrick, who was pregnant at the time of her evaluation, instead expressed worry about her pregnancy and the future. *Id*.

Dr. Ruedi found Fredrick appropriately groomed and fully ambulatory, with adequate affect and marginal abstract thought. [Tr. 349]. Based on the evaluation, Dr. Ruedi opined that Fredrick was capable of interacting socially and adapting to her environment. [Tr. 350]. She diagnosed Fredrick with adjustment disorder with mixed anxiety and depressed mood, posttraumatic stress disorder, and personality disorder. *Id*.

Dr. Martin Isenberg, Ph.D. examined Fredrick's record in advance of her hearing. He diagnosed Fredrick with affective disorders, anxiety-related disorders, and personality disorders. [Tr. 52]. Dr. Isenberg opined that Fredrick was mildly restricted in daily activities, moderately restricted in maintaining concentration, persistence, or pace, and that she might be hindered in a

3

public setting. [Tr. 52-53]. Dr. Isenberg then concluded that Fredrick faced social interaction limitations, but found no limitations in understanding, memory, or sustained concentration or persistence. [Tr. 54]. He did not note any physical limitations.

At her hearing, Fredrick testified that she lived with her husband, parents, brother, and infant child. [Tr. 31]. Fredrick stated that she can drive, which she does a couple times monthly when going shopping, but that otherwise she spends most of her time at home. [Tr. 31, 35]. Fredrick reported that she takes care of her daughter, watches television, plays games on her computer, and works on her homeschooling assignments. [Tr. 36]. She shops, cleans, and infrequently prepares meals. [Tr. 37].

Fredrick testified that she was taking Gabapentin, Zolmitriptan, Promethazine, Setraline, and birth control medications. [Tr. 43]. She stated that she suffers repeated episodes of headaches and physical pain. Her headaches occur several days per week and cause piercing pain; her right arm experiences numbness and pain two or three times weekly; and her right leg displays numbness, tingling, and spasms on a regular basis. [Tr. 40-41]. During these episodes, Fredrick testified, she primarily stays in bed and requires assistance dressing, bathing, and caring for her daughter, a situation that causes her anxiety. [Tr. 39, 43].

A vocational expert also testified at Fredrick's hearing. In response to a hypothetical question posed by the ALJ, the expert offered three jobs that the hypothetical individual could perform: weight recorder, marking clerk, and router. [Tr. 46].

### B. ALJ's Decision

After the hearing, the ALJ issued a decision on February 10, 2014. She found that Fredrick suffered from the following severe impairments: depression, anxiety, PTSD, and personality disorder. Relying on the vocational expert's testimony, the ALJ concluded that

Fredrick is unable to perform past relevant work but, considering her age, education, experience, and limitations, Fredrick could find other jobs that exist in significant numbers in the national economy.

> As part of this analysis, the ALJ assessed Fredrick's RFC as follows:
>
> [Fredrick] has the residual function capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine and repetitive tasks requiring no public interaction and occasional interaction with others.

[Tr. 16].

The ALJ reached this RFC by giving "great weight" to Dr. Ruedi's opinion and "significant weight" to Dr. Isenberg's opinion. In doing so, the ALJ discussed the mild to moderate mental impairments found by Dr. Ruedi and Dr. Isenberg, and concluded that these findings were consistent with the medical record because Fredrick repeatedly denied depression to her treating physicians and never sought mental health treatment. [Tr. 18].

### I. Discussion

A district court will reverse the Commissioner's findings "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Fredrick argues that the ALJ erred, first in formulating her RFC and second in granting significant weight to Dr. Isenberg's opinion. She further argues that substantial evidence does not support the ALJ's determination at Step 5 of the sequential evaluation process, which found Fredrick capable of performing other jobs that exist in significant numbers in the national economy.

#### A. Formulation of the RFC

5

A claimant's RFC reflects "what the claimant can still do" despite the combined effects of her credible limitations. *Bradshaw v. Heckler,* 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 416.945. In formulating an RFC, "the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect" her exertional capacities. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The claimant nevertheless carries the burden of proving her RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

Before determining Fredrick's RFC, the ALJ found that "her physical condition(s) are non-severe." [Tr. 14]. Citing Social Security Regulation 96-8p, Fredrick argues that the ALJ was obligated to include this finding in her RFC. Yet the regulation does not require the automatic inclusion of non-severe impairments; rather, it simply states that the ALJ must consider these impairments. SSR 96-8P, 1996 WL 374184J (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe.""). *See also* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe" . . . when we assess your residual functional capacity.").

The record reflects—and Fredrick does not dispute—that the ALJ considered her physical allegations in substantial detail and ultimately decided that they "do[] not result in a greater degree of functional limitation than stated in the [RFC]." [Tr. 14]. In reaching this conclusion, the ALJ discussed the extensive testing conducted by physicians at Centerpoint Medical Center in response to Fredrick's allegations of pain. The testing ruled out neurological disorders, rheumatologic disorders, viral diseases, autoimmune diseases, multiple sclerosis, blood infections, and bacterial infections. *See* [Tr. 233-36, 242-43, 245, 248-65, 279-81, 287-90,

6

Case 4:15-cv-00487-NKL   Document 20   Filed 02/25/16   Page 6 of 16

291-304, 309, 320, 362, 478-80, 506, 521]. Fredrick's physicians speculated that her pain was either psychological in origin, [Tr. 233-35, 279-81, 506], or otherwise caused by migraine headaches that Fredrick could control through medication, [Tr. 506]. Accordingly, the ALJ discounted Fredrick's credibility as to the severity of her pain and determined that, to the degree she has physical ailments, these ailments are not severe.[1]

While Fredrick nevertheless argues "it is clear there [was] something going on," [Doc. 12, p. 9], substantial evidence supports the ALJ's findings. After extensive laboratory and diagnostic evaluations, Fredrick's blood tests, MRIs, metabolic panel, cultures, viral serology, and x-rays were all unremarkable. [Tr. 553-54, 233-35, 242-43, 248-58, 279, 291-297, 309, 320, 478-80]. Fredrick points to several abnormal laboratory results, and uses online sources to argue that these results indicate the presence of an inflammatory process. Yet normal neurology and rheumatology tests followed those findings. *See* [Tr. 279, 506]. Fredrick has the burden of proving disability, *Wiseman v. Sullivan,* 905 F.2d 1153, 1156 (8th Cir. 1990), and her reliance on internet sources cannot overcome the weight of the record.

Fredrick also argues that her RFC is deficient because the ALJ gave "great weight" to Dr. Ruedi's opinion but did not include in the RFC Dr. Ruedi's "confirm[ation] [Fredrick] could only concentrate and persist on short tasks." [Doc. 12, p. 12]. In her opinion, however, Dr. Ruedi merely remarks that "[d]uring evaluation, Mrs. Fredrick demonstrated the ability to understand and remember instructions and to sustain concentration and persistence in short tasks." [Tr. 350]. This statement indicates simply that Fredrick performed short tasks during her evaluation—not that she was incapable of performing longer tasks as well.

The ALJ did not err in assessing Fredrick's RFC.

### B. Weight Given to Dr. Isenberg's Opinion

---

[1] Fredrick does not challenge the ALJ's credibility determination on this appeal.

Fredrick also challenges the weight given to Dr. Isenberg's opinion. As an initial matter, because Dr. Isenberg is a non-examining state physician, Fredrick argues that his opinion cannot constitute substantial evidence to support the ALJ's decision. Yet as the Eighth Circuit has remarked, "[i]t is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir. 2004). *See also Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) ("The regulations specifically provide that the opinions of non-treating physicians may be considered.") (*citing* 20 C.F.R. § 404.1527(f)).

Fredrick relies on a line of Eighth Circuit cases where the opinion of a non-examining consulting physician was not afforded any weight. Those cases make clear, however, that such an opinion "does not *generally* constitute substantial evidence," *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998) (emphasis added), and thus it "alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). In each case, therefore, the Eighth Circuit discounted the consulting physician's opinion because it was inconsistent with other, more persuasive evidence on the record, not simply because it was provided by a non-examining consultant. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Hancock v. Secretary of Dept. of Health, Educ. and Welfare*, 603 F.2d 739, 740 (8th Cir. 1979).[2]

---

[2] Fredrick also cites to *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), a case where the ALJ relied solely on the opinion of non-examining consulting physicians. The Eighth Circuit found "there is no *medical* evidence about how [the claimant's] impairments affect his ability to function now," and that "this does not satisfy the ALJ's duty to fully and fairly develop the record." *Id.* at 858 (emphasis in original). To the extent Fredrick is arguing that the ALJ erroneously relied on Dr. Isenberg's opinion rather than seeking additional opinions from Fredrick's treating physicians, this argument is unavailing. *Nevland* applies only at Step 5 of the sequential evaluation process, once the claimant has shown she cannot perform past work and the burden of production shifts to the ALJ. *Harris v. Barnhart,* 356 F.3d 926, 931 n. 2 (8th Cir. 2004); *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir. 2004). In Fredrick's case, the ALJ found that her physical impairments were non-severe, and accordingly, at Step 5, the ALJ's

8

Fredrick's case is accordingly distinguishable. She has not shown, and does not argue, that Dr. Isenberg's opinion is inconsistent with the medical records provided by any of her treating physicians.

Instead, Fredrick contends that Dr. Isenberg's opinion cannot constitute substantial evidence because it is internally inconsistent. Dr. Isenberg opined on the MDI assessment that Fredrick has mild difficulties with social functioning and moderate difficulties maintaining concentration, persistence, or pace. [Tr. 52]. Dr. Isenberg also completed the MRFC assessment form, on which he noted social interaction limitations but not concentration and persistence limitations. [Tr. 54]. Because he identified limitations in an area of mild difficulty, Fredrick argues, Dr. Isenberg was inconsistent in failing to identify any limitations in the areas of concentration and persistence, where he found moderate difficulties.

Fredrick's argument glosses over the wording of the MDI and MRFC assessments. While the MDI assessment asks whether the claimant has difficulties "[m]aintaining concentration, [p]ersistance, or [p]ace," the MRFC assessment asks whether "the individual ha[s] sustained concentration and persistence limitations." *See* [Tr. 52, 54]. By its wording, therefore, the MRFC form inquires only into "sustained" concentration and persistence restrictions absent any mention of pace. Dr. Isenberg could fairly have been indicating that Fredrick's concentration and persistence difficulties, while moderate, still did not rise to a "sustained" level. *See* 20 C.F.R. §§ 404.1520a(c)(4) (defining "moderate" as less than "marked" but more than "mild"). He also could have been indicating that Fredrick has moderate pace difficulties, but no

---

obligation was only to show that Fredrick could perform other jobs in the national economy despite her mental impairments. On this issue the ALJ considered the opinion of Dr. Ruedi, an opinion Fredrick does not challenge. Dr. Ruedi is not considered a non-examining consulting physician because she examined Fredrick, and so *Nevland* does not apply here. *See Nevland*, 204 F.3d at 858 (discussing only "opinions of doctors who have not examined the claimant").

9

difficulties with concentration or persistence.  Accordingly, the Court cannot say Dr. Isenberg rendered an inconsistent opinion or that the ALJ erred in relying on it.

Finally, Fredrick maintains that it is impossible to determine which part of Dr. Isenberg's opinion is his and which part is that of the single decision-maker.  A single decision-maker is not an acceptable medical source, and thus any record he produces cannot constitute substantial evidence.  20 C.F.R. §§ 404.906(b)(2).  However, the Court has reviewed Dr. Isenberg's opinion in the record and concludes, contrary to Fredrick's argument, that Dr. Isenberg's signature is plainly displayed at the bottom of each assessment he provides.  *See* [Tr. 53, 54, 56].  The Court is satisfied that the medical opinion provided immediately above Dr. Isenberg's signature is his own.

### C.  The Vocational Expert's Testimony

At Step 5 of the sequential evaluation process, the burden of production shifts to the ALJ, *Harris*, 356 F.3d at 931, who must produce evidence "that other work exists in substantial numbers in the national economy that the claimant is able to perform," *Eichelberger*, 390 F.3d at 591.[3]

Fredrick argues that the ALJ erred by presenting the vocational expert a hypothetical question that did not reflect her RFC.  In making this argument, Fredrick points to several inconsistencies between the RFC and the ALJ's hypothetical question, as well as between the hypothetical question and the vocational expert's testimony.  Fredrick fails to establish, however, how these inconsistencies prejudiced her case such that remand or reversal is necessary.  *Hepp v.*

---

[3]  Fredrick argues in her reply brief that the burden of *persuasion* shifts to the ALJ at Step 5.  In support of this argument, however, Fredrick cites cases decided before 2003, when, according to the Eighth Circuit, "[t]he Commissioner . . . promulgated a new rule designed to clarify that although a burden of production shifts to the Commissioner at step five, the ultimate burden of persuasion remains with the claimant."  *Harris v. Barnhart*, 356 F.3d 926, 931 n. 2 (8th Cir. 2004) (*citing* 68 Fed.Reg. 51153, 51155 (Aug. 26, 2003)).

*Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (a deficiency in the ALJ's opinion does not require reversal if it has no bearing on the outcome).

### 1. Limiting Fredrick to "Simple, Routine, Repetitive" Work

Fredrick notes that the ALJ found moderate concentration, persistence, and pace limitations, but that these limitations were not present in the hypothetical question, which described only an individual limited to "simple, routine, [and] repetitive tasks." [Tr. 46]. While an ALJ's hypothetical question must be "properly phrased" to constitute substantial evidence, *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001), it "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments," *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir. 1996). When drawing this line, the Eighth Circuit has asked whether a hypothetical question adequately captures the impairments at issue. *Howard*, 255 F.3d at 581-82.

In *Howard*, the Eighth Circuit proceeded to find that "the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [the claimant's] deficiencies in concentration, persistence or pace." *Id*. at 82. In doing so it relied on *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997), which similarly found that the "ability to do only simple routine repetitive work, which does not require close attention to detail" adequately captured deficiencies of concentration, persistence or pace.

Both *Howard* and *Brachtel* are analogous to Fredrick's case. As in *Howard* and *Brachtel*, the ALJ's hypothetical question limits Fredrick to simple, routine, and repetitive tasks, a limitation that adequately captures deficiencies in concentration, persistence, and pace.

Nevertheless, Fredrick cites *Porter v. Colvin*, 2015 WL 3843268 (W.D. Mo. June 22, 2015) and *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996) for the proposition that "[a] limitation

11

to simple, routine, repetitive work does not account for moderate difficulties maintaining concentration, persistence, or pace." [Doc. 12, p. 7]. Neither case categorically stands for such proposition. *Porter* addressed the issue in context of an ALJ decision that disregarded substantial evidence on the record and, therefore, was already being remanded for further proceedings. *Porter*, 2015 WL 3843268, at *7. Newton, meanwhile, found only that "simple work" could not sufficiently capture persistence and pace problems where the vocational expert testified that these problems would cause daily difficulties regardless of the job's skill level. *Newton*, 92 F.3d at 695.

The ALJ did not err in phrasing this part of her hypothetical question.

### 2. Other Inconsistencies between the RFC and Hypothetical Question

Fredrick points to several other inconsistencies between the ALJ's RFC and hypothetical question, none of which amount to reversible error.

First, Fredrick contends that the ALJ's hypothetical question—which limited an individual to "light work requiring no climbing of ladders, ropes or scaffolds"—did not reflect the exertional level established in the RFC, which found Fredrick could perform "a full range of work at all exertional levels." [Tr. 16, 46]. In essence, Fredrick is thus arguing that the question posed to the vocational expert was *too* restrictive in its limitations. Yet if the vocational expert could offer jobs that exist in the national economy under a more restrictive hypothetical, those same jobs would necessarily still apply to Fredrick's less-restrictive RFC. *See* SSR 00-4p, 2000 WL 1898704 (December 4, 2000) (noting that the DOT lists the maximum requirements of an occupation).

Second, Fredrick argues that the RFC and hypothetical question are inconsistent because the former limits her to "no public interaction and occasional interaction with others," whereas

12

the latter describes a job "requiring no interaction with the public and occasional interaction with co-workers." [Tr. 16, 46]. The difference between "others" and "co-workers" is significant, Fredrick maintains, because it does not account for supervisors, who are not co-workers and therefore are not encompassed in the hypothetical question. She contends this is an issue because Dr. Isenberg, to whose opinion the ALJ gave significant weight, opined that Fredrick would have moderate difficulty accepting instructions from supervisors and responding appropriately to their criticism. *See* [Tr. 54].

Even assuming the vocational expert did not consider supervisors as "co-workers," the jobs he provided all require the lowest level of interaction with others, supervisors and co-workers alike. Substantial evidence thus supports the ALJ's hypothetical and reversal is unnecessary. *Miller v. Colvin*, 2014 WL 2159004, at *5 (W.D. Mo. May 23, 2014) (finding no reversible error on a similar challenge because the jobs provided by the vocational expert did not require significant social interaction). Moreover, while Fredrick relies on Dr. Isenberg's opinion to suggest that she is particularly limited interacting with supervisors, Dr. Isenberg noted that "[Fredrick] attributed her work related deficits to her physical condition" and that "she reads and follows spoken directions very well." [Tr. 53]. Neither statement suggests significant supervisor issues. Dr. Isenberg only opined that Fredrick has moderate limitations interacting with supervisors when he filled out the MRFC assessment. *See* [Tr. 54]. The ALJ was not required to include a limitation based on a check-marked box in the MRFC, even if she included another limitation—Fredrick's limited ability to interact with the public—which was provided by Dr. Isenberg on the same form. *See Robertson v. Colvin*, 2014 WL 106117, at *5 (W.D. Mo. Jan. 10, 2014) (finding the ALJ could include limitations interacting with the general public but not

13

with supervisors or co-workers, even though the physician's MRFC form indicated limitations in all three).

Third, Fredrick argues that the hypothetical question does not set forth an education level, and therefore it is impossible to know how, if at all, the vocational expert considered her educational background. In framing the hypothetical, the ALJ merely described "a hypothetical individual of [Fredrick's] . . . education." [Tr. 46].

The social security regulations generally consider a claimant to have "marginal education" if she has completed six or fewer grades of formal schooling. 20 C.F.R. § 404.1564(b)(2). A claimant with this background has the "skills which are needed to do simple, unskilled types of jobs." *Id*. Meanwhile, a claimant with seven to eleven grades of formal schooling generally has "limited education." 20 C.F.R. § 404.1564(b)(3); *Walston v. Sullivan*, 956 F.2d 768, 771 (8th Cir. 1992). Because Fredrick dropped out of school in eighth grade and testified she was home-schooling at a tenth grade level, the ALJ found her education level "limited"—a finding Fredrick does not challenge. [Tr. 31, 18]. Fredrick thus can perform the unskilled jobs identified by the vocational expert. *See* DOT 222.387-074 (weight recorder); DOT 209.587-034 (marking clerk); DOT 222.587-038 (router) (all indicating an SVP level of 2); *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (occupations with an SVP of 2 are unskilled).[4] Therefore, substantial evidence supports the ALJ's findings at Step 5, and reversal on this ground is unnecessary.

### 3. Inconsistency Between the Hypothetical Question and Vocational Expert Testimony

---

[4] Fredrick maintains the ALJ must establish that Fredrick could read, write, and reason at the levels set forth in the DOT's definition of "weight recorder." [Doc. 19, p. 4]. However, Fredrick offers no authority for this suggestion that an ALJ must expressly find a claimant capable of performing each component of a given occupation.

Similarly, Fredrick notes that a weight recorder, one of the three jobs selected by the vocational expert, is not considered "repetitive" in the Dictionary of Occupational Titles. *See* DOT 222.387-074. As such, she argues, the vocational expert's testimony conflicts with the hypothetical question and the RFC—both of which were limited in scope to repetitive jobs—and therefore cannot constitute substantial evidence.

When a conflict exists between the vocational expert's testimony and the DOT's job description, the ALJ carries an affirmative obligation to explain and resolve this disagreement. SSR 00-4p, 2000 WL 1898704 (December 4, 2000). The record indicates that the ALJ did not resolve the conflict between her hypothetical question and the vocational expert's testimony. Consequently, the vocational expert's testimony that Fredrick can perform the job of weight recorder is not entitled substantial evidence. *See Jones v. Barnhart,* 315 F.3d 974, 979 (8th Cir. 2003).

However, if the ALJ's error is harmless, the Court need not remand or reserve Fredrick's case. *Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007) (finding that the ALJ's failure to ask about conflicts was a harmless error). While the vocational expert provided one occupation that does not match the ALJ's "repetitive" limitation, he offered two others that contain this restriction: marking clerk and router. *See* DOT 209.587-034; DOT 222.587-038. Between these two occupations, the vocational expert testified that 5,620 jobs exist in Missouri and 259,800 exist in the national economy. [Tr. 46]. These figures constitute substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs in the economy Fredrick can perform. *See Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (one available occupation with 32,000 jobs nationally constitutes substantial evidence); *Long v. Chater,* 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in the state and 30,000 jobs nationally constitute substantial evidence).

Accordingly, there is substantial evidence that Fredrick can perform jobs that exist in substantial numbers in the national economy.

## III.     Conclusion

For the foregoing reasons, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  February 25, 2016
Jefferson City, Missouri

16

Case 4:15-cv-00487-NKL   Document 20   Filed 02/25/16   Page 16 of 16